Opinion
 

 HUFFMAN, J.
 

 The California Commission on State Mandates (the Commission) denied a test claim by the Redevelopment Agency of the City of San Marcos (the Agency) (Gov. Code, § 17550 et seq.), which sought a determination that the State of California should reimburse the Agency for moneys transferred into its Low and Moderate Income Housing Fund (the Housing Fund) pursuant to Health and Safety Code
 
 [1]
 
 sections 33334.2 and 33334.3. Those sections require a 20 percent deposit of the particular form of financing received by the Agency, tax increment financing generated from its project areas, for purposes of improving the supply of affordable housing. The Agency claimed that this tax increment financing should not be subject to state control of the allocations made to various funds and that such control constituted a state-mandated new program or higher level of service for which reimbursement or subvention was required under article XIII B of the California Constitution, section 6 (hereafter section 6; all further references to articles are to the California Constitution).
 
 [2]
 
 (Cal. Const., art. XVI, § 16; § 33670.)
 

 The Agency brought a petition for writ of administrative mandamus to challenge the decision of the Commission. (Code Civ. Proc., § 1094.5; Gov. Code, § 17559.) The superior court denied the petition, ruling that the source of funds used by the Agency for redevelopment, tax increment financing, was exempt pursuant to section 33678 from the scope of section 6, as not constituting “proceeds of taxes” which are governed by that section. The superior court did not rule upon the alternative grounds of decision stated by the Commission, i.e., the 20 percent set-aside requirement for low- and moderate-income housing did not impose a new program or higher level of service in an existing program within the meaning of section 6, and, further, there were no costs subject to reimbursement related to the Housing Fund because there was no net increase in the aggregate program responsibilities of the Agency.
 

 The Agency appeals the judgment denying its petition for writ of mandate. For the reasons set forth below, we affirm.
 

 
 *980
 
 I
 

 Procedural Context
 

 This test claim was litigated before the Commission pursuant to statutory procedures for determining whether a statute imposes state-mandated costs upon a local agency which must be reimbursed, through a subvention of funds, under section 6. (Gov. Code, § 17500 et seq.)
 
 [3]
 
 The Commission hearing consisted of oral argument on the points and authorities presented.
 

 Under Government Code section 17559, review by administrative mandamus is the exclusive method of challenging a Commission decision denying a subvention claim. “The determination whether the statutes here at issue established a mandate under section 6 is a question of law. [Citation.]”
 
 (County of San Diego
 
 v.
 
 State of California
 
 (1997) 15 Cal.4th 68, 109. [61 Cal.Rptr.2d 134, 931 P.2d 312].) On appellate review, we apply these standards: “Government Code section 17559 governs the proceeding below and requires that the trial court review the decision of the Commission under the substantial evidence standard. Where the substantial evidence test is applied by the trial court, we are generally confined to inquiring whether substantial evidence supports the court’s findings and judgment. [Citation.] However, we independently review the superior court’s legal conclusions about the meaning and effect of constitutional and statutory provisions. [Citation.]”
 
 (City of San Jose
 
 v.
 
 State of California
 
 (1996) 45 Cal.App.4th 1802, 1810 [53 Cal.Rptr.2d 521].)
 

 II
 

 Statutory Schemes
 

 Before we outline the statutory provisions setting up tax increment financing for redevelopment agencies, we first set forth the Supreme Court’s recent summary of the history and substance of the law applicable to state mandates, such as the Agency claims exist here: “Through adoption of Proposition 13 in 1978, the voters added article XIII A to the California Constitution, which ‘imposes a limit on the power of state and local governments to
 
 *981
 
 adopt and levy taxes. [Citation.] ’ [Citation.] The next year, the voters added article XIII B to the Constitution, which ‘imposefs] a complementary limit on the rate of growth in governmental spending.’ [Citation.] These two constitutional articles ‘work in tandem, together restricting California governments’ power both to levy and to spend for public purposes.’ [Citation.] Their goals are ‘to protect residents from excessive taxation and government spending. [Citation.]’ [Citation.]”
 
 (County of San Diego
 
 v.
 
 State of California, supra,
 
 15 Cal.4th at pp. 80-81.)
 

 Section 6, part of article XIII B and the provision here at issue, requires that whenever the Legislature or any state agency mandates a “new program or higher level of service” on any local government, “ ‘the state shall provide a subvention of funds to reimburse such local government for
 
 the costs of such program
 
 or increased level of service . . . .’”
 
 (County of San Diego
 
 v.
 
 State of California, supra,
 
 15 Cal.4th at p. 81, italics added.) Certain exceptions are then stated, none of which is relevant here.
 
 [4]
 

 In
 
 County of San Diego
 
 v.
 
 State of California, supra,
 
 15 Cal.4th at page 81, the Supreme Court explained that section 6 represents a recognition that together articles XIII A and XIII B severely restrict the taxing and spending powers of local agencies. The purpose of the section is to preclude the state from shifting financial responsibility for governmental functions to local agencies, which are ill equipped to undertake increased financial responsibilities because they are subject to taxing and spending limitations under articles XIII A and XIII B.
 
 (County of San Diego
 
 v.
 
 State of California, supra,
 
 at p. 81.)
 

 To evaluate the Agency’s argument that the provisions of sections 33334.2 and 33334.3, requiring a deposit into the housing fund of 20 percent of the tax increment financing received by the Agency, impose this type of reimbursable governmental program or a higher level of service under an existing program, we first review the provisions establishing financing for redevelopment agencies. Such agencies have no independent powers of taxation
 
 (Huntington Park Redevelopment Agency
 
 v.
 
 Martin
 
 (1985) 38 Cal.3d
 
 *982
 
 100, 106 [211 Cal.Rptr. 133, 695 P.2d 220]), but receive a portion of tax revenues collected by other local agencies from property within a redevelopment project area, which may result from the following scheme: “Redevelopment agencies finance real property improvements in blighted areas. Pursuant to article XVI, section 16 of the Constitution, these agencies are authorized to use tax increment revenues for redevelopment projects. The constitutional mandate has been implemented through the Community Redevelopment Law (Health & Saf. Code, § 33000 et seq.). [‘JD The Community Redevelopment Law authorizes several methods of financing; one is the issuance of tax allocation bonds. Tax increment revenue, the increase in annual property taxes attributable to redevelopment improvements, provides the security for tax allocation bonds. Tax increment revenues are computed as follows: The real property within a redevelopment project area is assessed in the year the redevelopment plan is adopted. Typically, after redevelopment, property values in the project area increase. The taxing agencies (e.g., city, county, school or special district) keep the tax revenues attributable to the original assessed value and pass the portion of the assessed property value which exceeds the original assessment on to the redevelopment agency. (Health & Saf. Code, §§ 33640, 33641, 33670, 33675). In short, tax increment financing permits a redevelopment agency to take advantage of increased property tax revenues in the project areas without an increase in the tax rate. This scheme for redevelopment financing has been a part of the California Constitution since 1952. (Cal. Const., art. XVI, § 16.)”
 
 {Brown
 
 v.
 
 Community Redevelopment Agency
 
 (1985) 168 Cal.App.3d 1014, 1016-1017 [214 Cal.Rptr. 626].)
 
 [5]
 

 In
 
 Brown
 
 v.
 
 Community Redevelopment Agency, supra,
 
 168 Cal.App.3d at pages 1016-1018, the court determined that by enacting section 33678, the Legislature interpreted article XIII B of the Constitution as not broad enough in reach to cover the raising or spending of tax increment revenues by redevelopment agencies. Specifically, the court decided the funds a redevelopment agency receives from tax increment financing do not constitute “proceeds of taxes” subject to article XIII B appropriations limits.
 
 {Brown
 
 v.
 
 Community Redevelopment Agency, supra,
 
 at p. 1019).
 
 [6]
 
 This ruling was based on section 33678, providing in pertinent part: “This section implements and fulfills the intent... of Article XIII B and Section 16 of Article
 
 *983
 
 XVI of the California Constitution.
 
 The allocation and payment to an agency of the portion of taxes specified in subdivision (b) of Section 33670 for the purpose of paying principal of, or interest on
 
 . . .
 
 indebtedness incurred for redevelopment activity .
 
 . .
 
 shall not be deemed the receipt by an agency of proceeds of taxes levied by or on behalf of the agency within the meaning of or for the purposes of Article XIII B .
 
 . .
 
 nor shall such portion of taxes be deemed receipt of proceeds of taxes by, or an appropriation subject to limitation of, any other public body within the meaning or for purposes of Article XIII B
 
 ... or any statutory provision enacted in implementation of Article XIII B.
 
 The allocation and. payment to an agency of this portion of taxes shall not be deemed the appropriation by a redevelopment agency of proceeds of taxes levied by or on behalf of a redevelopment agency within the meaning or for purposes of Article XIII B of the California
 
 Constitution.” (Italics added.)
 

 In
 
 County of Placer
 
 v.
 
 Corin
 
 (1980) 113 Cal.App.3d 443, 451 [170 Cal.Rptr. 232], the court defined “proceeds of taxes” in this way: “Under article XIII B, with the exception of state subventions, the items that make up the scope of ‘ “proceeds of taxes" ’ concern charges levied to raise
 
 general revenues
 
 for the local entity. ‘ “Proceeds of taxes,” ’ in addition to ‘all tax revenues’ includes ‘proceeds . . . from . . . regulatory licenses, user charges, and user fees
 
 [only] to the extent that such proceeds exceed the costs reasonably borne by such entity in providing the regulation, product or service.
 
 ...’(§ 8, subd. (c).) (Italics added.) Such ‘excess’ regulatory or user fees are but
 
 taxes
 
 for the raising of general revenue for the entity. [Citations.] Moreover, to the extent that an assessment results in revenue above the cost of the improvement or is of general public benefit, it is no longer a special assessment but a tax. [Citation.]
 
 We conclude ‘proceeds of taxes’ generally contemplates only those impositions which raise general tax revenues for the entity.”
 
 (Italics
 
 [7]
 

 In light of these interrelated sections and concepts, our task is to determine whether the 20 percent Housing Fund set-aside requirement of a redevelopment agency’s tax increment financing qualifies under section 6 as a “cost” of a program. As will be explained, we agree with the trial court that the resolution of this issue is sufficient to dispose of the entire matter, and
 
 *984
 
 accordingly we need not discuss the alternate grounds of decision stated by the Commission.
 
 [8]
 

 Ill
 

 Housing Fund Allocations: Reimbursable Costs?
 

 1.
 
 Arguments
 

 The Agency takes the position that the language of section 33678 is simply inapplicable to its claim for subvention of funds required to be deposited into the Housing Fund. It points out that section 6 expressly lists three exceptions to the requirement for subvention of funds to cover the costs of state-mandated programs: (a) Legislative mandates requested by the local agency affected; (b) legislation defining or changing a definition of a crime; or (c) pre-1975 legislative mandates or implementing regulations or orders. (See fn. 4,
 
 ante.)
 
 None of these exceptions refers to the source of the funding originally used by the agency to pay the costs incurred for which reimbursement is now being sought. Thus, the agency argues it is immaterial that under section 33678,
 
 for purposes of appropriations limitations,
 
 tax increment financing is not deemed to be the “proceeds of taxes.”
 
 (Brown
 
 v.
 
 Community Redevelopment Agency, supra,
 
 168 Cal.App.3d at pp. 1017-1020.) The Agency would apply a “plain meaning” rule to section 6 (see, e.g.,
 
 Davis
 
 v.
 
 City
 
 o/Berkeley (1990) 51 Cal.3d 227, 234 [272 Cal.Rptr. 139, 794 P.2d 897]) and conclude that the source of the funds used to pay the program costs up front, before any subvention, is not stated in the section and thus is not relevant.
 

 As an illustration of its argument that the source of its funds is irrelevant under section 6, the Agency cites to Government Code section 17556. That section is a legislative interpretation of section 6, creating several classes of state-mandated programs for which no state reimbursement of local agencies for costs incurred is required. In
 
 County of Fresno
 
 v.
 
 State of California
 
 (1991) 53 Cal.3d 482, 487 [280 Cal.Rptr. 92, 808 P.2d 235], the Supreme Court upheld the facial constitutionality of Government Code section 17556, subdivision (d), which disallows state subvention of funds where the local government is authorized to collect service charges or fees in connection with a mandated program. The court explained that section 6 “was designed to protect the tax revenues of local governments from state mandates that
 
 *985
 
 would require expenditure of such revenues.”
 
 (County of Fresno
 
 v.
 
 State of California, supra,
 
 at p. 487.) Based on the language and history of the measure, the court stated, “Article XIII B of the Constitution, however, was not intended to reach beyond taxation.”
 
 (Ibid.)
 
 The court therefore concluded that in view of its textual and historical context, section 6 “requires subvention only when the costs in question can be recovered
 
 solely from tax
 
 revenues.”
 
 (Ibid.,
 
 original italics.) Interpreting section 6, the court stated: “Considered within its context, the section effectively construes the term ‘costs’ in the constitutional provision as excluding expenses that are recoverable from sources other than taxes.”
 
 (Ibid.)
 
 No subvention was required where the local authority could recover its expenses through fees or assessments, not taxes.
 

 2.
 
 Interpretation of Section 6
 

 Here, the Agency contends the authority of
 
 County of Fresno
 
 v.
 
 State of California, supra, 53
 
 Cal.3d 482, should be narrowly read to cover only self-financing programs, and the Supreme Court’s broad statements defining “costs” in this context read as mere dicta. It also continues to argue for a “plain meaning” reading of section 6, which it reiterates does not expressly discuss the source of funds used by an agency to pay the costs of a program before any reimbursement is sought. We disagree with both of these arguments. The correct approach is to read section 6 in light of its historical and textual context. The rules of constitutional interpretation require a strict construction of section 6, because constitutional limitations and restrictions on legislative powers are not to be extended to include matters not covered by the language used.
 
 {City of San Jose
 
 v.
 
 State of California, supra,
 
 45 Cal.App.4th at pp. 1816-1817.)
 

 The goals of articles XIII A and XIII B are to protect California residents from excessive taxation and government spending.
 
 (County of Los Angeles
 
 v.
 
 State of California, supra,
 
 15 Cal.4th at p. 81.) A central purpose of section 6 is to prevent the state’s transfer of the cost of government from itself to the local level.
 
 (City of Sacramento
 
 v.
 
 State of California, supra,
 
 50 Cal.3d at p. 68.) The related goals of these enactments require us to read the term “costs” in section 6 in light of the enactment as a whole. The “costs” for which the Agency is seeking reimbursement are its deposits of tax increment financing proceeds into the Housing Fund. Those tax increment financing proceeds are normally received pursuant to the Community Redevelopment Law (§ 33000 et seq.) when, after redevelopment, the taxing agencies collect and keep the tax revenues attributable to the original assessed value and pass on to the redevelopment agency the portion of the
 
 *986
 
 assessed property value which exceeds the original assessment.
 
 (Brown
 
 v.
 
 Community Redevelopment Agency, supra,
 
 168 Cal.App.3d at pp. 1016-1017.) Is this the type of expenditure of tax revenues of local governments, upon state mandates which require use of such revenues, against which section 6 was designed to protect?
 
 (County of Fresno
 
 v.
 
 State of California, supra,
 
 53 Cal.3d at p. 487.)
 

 3.
 
 Relationship of Appropriations Limitations and Subvention
 

 We may find assistance in answering this question by looking to the type of appropriations limitations imposed by article XIII B. In
 
 County of Placer
 
 v.
 
 Corin, supra,
 
 113 Cal.App.3d at page 447, the court described the discipline imposed by article XIII B in this way: “[A]rticle XIIIB does not limit the ability to expend government funds collected from all sources. Rather, the appropriations limit is based on ‘appropriations subject to limitation,’ which consists primarily of the authorization to expend during a fiscal year the ‘proceeds of taxes.’ (§ 8, subd. (a).) As to local governments, limits are placed only on the authorization to expend the proceeds of taxes levied by that entity, in addition to proceeds of state subventions (§ 8, subd. (c)); no limitation is placed on the expenditure of those revenues that do not constitute ‘proceeds of taxes.’ ”
 
 [9]
 

 Because of the nature of the financing they receive, tax increment financing, redevelopment agencies are not subject to this type of appropriations limitations or spending caps; they do not expend any “proceeds of taxes.” Nor do they raise, through tax increment financing,
 
 “general revenues
 
 for the local entity.”
 
 (County of Placer
 
 v.
 
 Corin, supra,
 
 113 Cal.App.3d at p. 451, original italics.) The purpose for which state subvention of funds was created, to protect local agencies from having the state transfer its cost of government from itself to the local level, is therefore not brought into play when redevelopment agencies are required to allocate their tax increment financing in a particular manner, as in the operation of sections 33334.2 and 33334.3. (See
 
 City of Sacramento
 
 v.
 
 State of California, supra,
 
 50 Cal.3d at p. 68.) The state is not transferring to the Agency the operation and administration of a program for which it was formerly legally and financially
 
 *987
 
 responsible.
 
 (County of Los Angeles
 
 v.
 
 Commission on State Mandates
 
 (1995) 32 Cal.App.4th 805, 817 [38 Cal.Rptr.2d 304].)
 
 [10]
 

 For all these reasons, we conclude the same policies which support exempting tax increment revenues from article XIII B appropriations limits also support denying reimbursement under section 6 for this particular allocation of those revenues to the Housing Fund. Tax increment financing is not within the scope of article XIII B.
 
 (Brown
 
 v.
 
 Community Redevelopment Agency, supra,
 
 168 Cal.App.3d at pp. 1016-1020.) Section 6 “requires subvention only when the costs in question can be recovered
 
 solely from tax
 
 revenues.”
 
 (County of Fresno
 
 v.
 
 State of California, supra,
 
 53 Cal.3d at p. 487, original italics.) No state duty of subvention is triggered where the local agency is not required to expend its proceeds of taxes. Here, these costs of depositing tax increment revenues in the Housing Fund are attributable not directly to tax revenues, but to the benefit received by the Agency from the tax increment financing scheme, which is one step removed from other local agencies’ collection of tax revenues. (§ 33000 et seq.) Therefore, in light of the above authorities, this use of tax increment financing is not a reimbursable “cost” under section 6. We therefore need not interpret any remaining portions of section 6.
 

 Disposition
 

 The judgment is affirmed.
 

 Work, Acting P. J., and McIntyre, J., concurred.
 

 Appellant’s petition for review by the Supreme Court was denied September 3, 1997.
 

 [1]
 

 All further statutory references are to the Health and Safety Code unless otherwise noted.
 

 [2]
 

 “ ‘Subvention’ generally means a grant of financial aid or assistance, or a subsidy. [Citation.]”
 
 (Hayes
 
 v.
 
 Commission on State Mandates
 
 (1992) 11 Cal.App.4th 1564, 1577 [15 Cal.Rptr.2d 547].)
 

 [3]
 

 In our prior opinion issued in this case, we determined the trial court erred when it denied the California Department of Finance (DOF) leave to intervene as an indispensable party and a real party in interest in the mandamus proceeding.
 
 (Redevelopment Agency
 
 v.
 
 Commission on State Mandates
 
 (1996) 43 Cal.App.4th 1188, 1194-1199 [51 Cal.Rptr.2d 100].) Thus, DOF is now a respondent on this appeal, as is the Commission (sometimes collectively referred to as respondents). However, our decision in that case was a collateral matter and does not assist us on the merits of this proceeding.
 

 [4]
 

 Section 6 lists the following exclusions to the requirement for subvention of funds: “(a) Legislative mandates requested by the local agency affected; [DO (b) Legislation defining a new crime or changing an existing definition of a crime; or [DO (c) Legislative mandates enacted prior to January 1, 1975, or executive orders or regulations initially implementing legislation enacted prior to January 1, 1975.” In
 
 City of Sacramento
 
 v.
 
 State of California
 
 (1990) 50 Cal.3d 51, 69 [266 Cal.Rptr. 139, 785 P.2d 522], the Supreme Court identified these items as exclusions of otherwise reimbursable programs from the scope of section 6. (See also Gov. Code, § 17514, definition of “costs mandated by the state,” using the same “new program or higher level of service” language of section 6.)
 

 [5]
 

 Section 33071 in the Community Redevelopment Law provides that a fundamental purpose of redevelopment is to expand the supply of low- and moderate-income housing, as well as expanding employment opportunities and improving the social environment.
 

 [6]
 

 The term of art, “proceeds of taxes,” is defined in article XIII B, section 8, as follows: (c) “
 
 ‘Proceeds of taxes’ shall include, but not be restricted to, all tax revenues
 
 and the proceeds to an entity of government, from (1) regulatory licenses, user charges, and user fees to the extent that those proceeds exceed the costs reasonably borne by that entity in providing the regulation, product, or service, and (2) the investment of tax revenues. With respect to any
 
 *983
 
 local government, ‘proceeds of taxes’ shall include subventions received from the state, other than pursuant to Section 6, and, with respect to the state, proceeds of taxes shall exclude such subventions.” (Italics added.)
 

 [7]
 

 The issues before the court in
 
 County of Placer
 
 v.
 
 Corin, supra,
 
 113 Cal.App.3d 443 were whether special assessments and federal grants should be considered proceeds of taxes; the court held they should not. Section 6 is not discussed; the court’s analysis of other concepts found in article XIII B is nevertheless instructive.
 

 [8]
 

 The alternate grounds of the Commission’s decision were that there were no costs subject to reimbursement related to the Housing Fund because there was no net increase in the aggregate program responsibilities of the Agency, and that the set-aside requirement did not constitute a mandated “new program or higher level of service” under this section.
 

 [9]
 

 The term of art, “appropriations subject to limitation,” is defined in article XIIIB, section 8, as follows: [ID (b) “ ‘Appropriations subject to limitation’ of an entity of local government means any authorization to expend during a fiscal year
 
 the proceeds of taxes levied by or for that entity
 
 and the proceeds of state subventions to that entity (other than subventions made pursuant to Section 6) exclusive of refunds of taxes.” (Italics added.)
 

 [10]
 

 We disagree with respondents that the legislative history of sections 33334.2 and 33334.3 is of assistance here, specifically, that section 23 of the bill creating these sections provided that no appropriations were made by the act, nor was any obligation for reimbursements of local agencies created for any costs incurred in carrying out the programs created by the act. (Stats. 1976, ch. 1337, § 23, pp. 6070-6071.) As stated in
 
 City of San Jose
 
 v.
 
 State of California, supra,
 
 45 Cal.App.4th at pages 1817-1818, legislative findings regarding mandate are irrelevant to the issue to be decided by the Commission, whether a state mandate exists.